# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Stephanie Soto, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-01271 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Nurture, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Nurture, Inc. ("defendant") manufactures, distributes, labels and sells flavored rice puffs to babies in numerous varieties ("Products").




I.   The Products are Marketed to Developing Children

    2.   Defendant's front and back labels tout its health attributes, through the following:

- Pictures of fruits and vegetables

- "Organics"

- "Happy Baby"

- "Superfood"

- "Gluten Free"

- We are a team of real parents, pediatricians & nutritionists on a mission to bring health and happiness to our little ones and the planet.

- We create nutritious meals and snacks that make eating enlightened, effortless, and delicious. From our happy family to yours!

- Come meet our dedicated team and learn more about our carefully crafted products at happyfaimlyorganics.com.

- Our enlightened nutrition philosophy.

- 25 mg choline per serving to support brain & eye health.

- Antioxidant vitamins c & e 10% per serving.

- Vitamin b12 20% dv per serving.

- Made without cane syrup.

    3.   Defendant's online and print marketing further tout the Products' suitability for developing children:

- Superfood Puffs: Parents, meet your pantry's unsung hero Happy Baby Puffs are a melt-in-your-mouth Organic Snack fortified with Choline for eye & brain health;

- Irresistible in taste & texture, they're perfect for teaching babies tactility & self-

feeding!

- Organic Snacks For Baby: Happy Baby goes beyond baby food with delicious, Superfood Puffs;

- Babies may be ready for our delicious snacks when they can crawl on their hands and knees, without their tummy touching the ground;

- At Happy Baby Organics, we provide organic and delicious options for your baby's nutritional journey;

- We develop premium organic recipes perfectly matched with your child's age and stage This is enlightened nutrition for every family;

- Mindfully Made: We develop premium organic recipes perfectly matched with your child's age and stage;

- Explore our snacks & meals for growing babies, toddlers & kids, from baby food pouches to freeze-dried yogurt treats, organic Cereals & Toddler Snacks.

4.      However, nowhere in the labeling, advertising, statements, warranties, and/or packaging does defendant disclose that the Products contains significant levels of arsenic, mercury, lead, cadmium, and perchlorate[1] – all known to pose health risks to humans and especially infants.

5.      Parents trust manufacturers like defendant to sell baby food that is safe, nutritious, and free from harmful toxins, contaminants, and chemicals.

6.      They certainly expect the food they feed their infants and toddlers to be free from heavy metals, substances known to have significant and dangerous health consequences.

7.      However, consumers lack the scientific knowledge necessary to determine whether

---

[1] Healthy Babies Bright Future, What's In My Baby's Food?, What's In My Baby's Food?, (January 10, 2021).

the defendant's products do in fact contain heavy metals or to know or ascertain the true nature of the ingredients and quality of the products.

8.      Reasonable consumers therefore must and do rely on defendant to honestly report what its products contain.

9.      A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform reveals that parents' trust has been violated.

10.      The Subcommittee's investigation was spurred by "reports alleging high levels of toxic heavy metals in baby foods" and the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."

11.      The report revealed that "[i]nternal company standards permit dangerously high levels of toxic heavy metals, and… that the manufacturers have often sold foods that exceeded these levels."

12.      The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") declared arsenic, lead, cadmium, and mercury "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[2]

13.      These four heavy metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as the "permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[3]

14.      Even in trace amounts found in food, these heavy metals can alter the developing

---

[2] *See Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, Staff Report ("House Report"), Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, at 2, February 4, 2021, available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf.
[3] Healthy Babies Bright Futures Report, at 6.

brain and erode a child's IQ and increase risk of future criminal and antisocial behavior in children.[4]

15.     Research continues to confirm that exposures to food containing arsenic, lead, mercury, and cadmium causes "trouble risks for babies, including cancer and lifelong deficits in intelligence."[5]

A.  Arsenic

16.     When children are exposed to arsenic early in life, it causes "cognitive deficits among school-age children exposed early in life, and neurological problems in adults who were exposed to arsenic-poisoned milk as infants."[6]

17.     Arsenic exposure also creates a risk of "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system."[7]

18.     The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic and is also considering limiting the action level or arsenic in rice cereal for infants to 100 ppb.[8]

19.     The FDA has set 100 ppb inorganic arsenic as the limit in infant rice cereal, though Defendant's internal standard is 15% higher than the FDA limit, at 115 ppb.

20.     Defendant's products contain as much as 180 parts per billion (ppb) inorganic arsenic

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] House Report, at 10 (quoting Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/)).
[8] FDA, Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level (Apr.2016), https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM493152.pdf.

and over 25% of their products contained over 100 ppb inorganic arsenic.

### B. Lead

21.     Lead exposure can seriously harm children's brain and nervous systems and is associated with a range of negative health outcomes including "behavioral problems, decreased cognitive performance, delayed development, and reduced postnatal growth."[9]

22.     Young children are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults.

23.     In children, low levels of lead exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells.[10]

24.     EPA has set the maximum contaminant level goal for lead in drinking water at zero because lead is toxic metal that can be harmful to human health even at low exposure levels.

25.     Lead can bioaccumulate in the body over time, leading to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.[11]

26.     The Agency for Toxic Substances and Disease Registry states that there may be no threshold for lead with regards to developmental impact on children.

27.     Yet, Defendant's products have tested as high as 641 ppb lead and 20% of their products contained over 10 ppb lead

### C. Mercury

---

[9] House Report, at 11.
[10] See https://www.cdc.gov/nceh/lead/prevention/pregnant.htm.
[11] *See* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinkingwater.

28.     Mercury increases the risk for cardiovascular disease and can cause vision, intelligence, and memory problems for children exposed in utero.

29.     Mercury has been linked to higher risk of lower IQ scores and intellectual disability.

30.     The FDA has set a maximum mercury level in drinking water to 2 ppb.

31.     Defendant has sold finished baby food products containing as much as 10 ppb mercury.

D.  Cadmium

32.     Cadmium has been observed to cause anemia, liver disease, and nerve or brain damage in animals eating or drinking cadmium.

33.     Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage.

34.     Health and environmental regulatory bodies have set maximum cadmium levels in drinking water to 3 and 5 ppb.

35.     Sixty-five percent of Defendant's products contained more than 5 ppb cadmium.

II.  Defendant's Standards Permit Dangerously High Levels of Toxic Heavy Metals

36.     Defendant's internal company standards permit dangerously high levels of toxic heavy metals.

37.     Though Defendant conducts some testing for these substances, the products sold to consumers regardless of the level of heavy metals they contain.

38.      In fact, their testing is not even intended for the safety of their consumers – developing children.

39.     Defendant knows that its customers trust the quality of its products and that they expect defendant's products to be free of heavy metals.

40.     It also knows that all consumers seek out and wish to purchase baby foods that will

7

not cause harm or risk of harm, and that assurances of quality induces purchasers to pay more than they otherwise would.

41.    No reasonable consumer seeing defendant's marketing would expect the contaminated baby foods to contain heavy metals or other undesirable toxins or contaminants.

42.    Reasonable consumers, like plaintiff, would consider heavy metals at non-trace levels a material fact when considering what baby food to purchase.

43.    Not only do the Products not inform consumers they contain these components, their labels specifically state what harmful elements they do exclude – GMOs, non-organic ingredients, toxic persistent pesticides and packaging made without BPA, BPS, or phthalates.

44.    Since Defendant knows consumers dislike plastic residues, it is logical and expected they will dislike even more heavy metals which have harmful effects on children.

45.    Defendant misrepresented the Products through affirmative statements, half-truths, and omissions.

46.    Defendant sold more of the Product and at a higher price than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

47.    Had plaintiff and the proposed class members known the truth, they would not have bought the Product or would have paid less for it.

48.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $3.39 for containers of 2.1 OZ, excluding tax, compared to other similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Delayed Discovery

49.    Plaintiff and consumers would not have been able to discover Defendant's deceptive

practices and lacked the means to discover them given that, like nearly all consumers, they rely on

and are entitled to rely on the manufacturer's obligation to disclose material facts.

50.     Furthermore, Defendant's labeling practices and nondisclosures impeded Plaintiff's

abilities to discover the deceptive and unlawful labeling throughout the Class Period.

### Jurisdiction and Venue

51.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28

U.S.C. § 1332(d)(2).

52.     Under CAFA, district courts have original federal jurisdiction over class actions

involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity.

53.     The home state exceptions to CAFA are not applicable.

54.     Plaintiff Stephanie Soto is a citizen of New York who seeks to represent a class of

New York and Wyoming citizens.

55.     Defendant Nurture, Inc. is a Delaware corporation with a principal place of business

in White Plains, Westchester County, New York.

56.     Diversity exists because plaintiff Stephanie Soto seeks to represent a class of persons

which includes citizens of a state diverse from Defendant.

57.     Upon information and belief, sales of the Products and any available statutory and

other monetary damages, exceed $5 million during the applicable statutes of limitations, exclusive

of interest and costs.

58.     Venue is proper because a substantial part of the events or omissions giving rise to

the claim occurred here – plaintiff's purchase of the Product.

59.     Venue is further supported because many class members reside in this District.

Parties

60.     Plaintiff Stephanie Soto is a citizen of Bronx, Bronx County, New York.

61.     Defendant Nurture, Inc. is a Delaware corporation with a principal place of business in White Plains, New York, Westchester County.

62.     Defendant is an established maker baby food and touts its unique expertise, founded by those who purported to bring real-world experience to development of children.

63.     The Product is sold to consumers from retail and online stores of third-parties across the country.

64.     Plaintiff bought the Product on one or more occasions within the statute of limitations for each cause of action alleged, from one or more locations, such asAmazon.com, Walmart and Foodtown of Bainbridge, 283 E 204th St, The Bronx, NY 10467, within the past week and throughout the past two years for the consumption of children.

65.     Plaintiff bought the Product at or exceeding the above-referenced price because she wanted to buy a product with the qualities and attributes represented herein and relied upon what the label indicated or omitted.

66.     Plaintiff would not have purchased the Products in the absence of Defendant's misrepresentations and omissions.

67.     The Product were worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

68.     Plaintiff intends to, seeks to, and will purchase the Products again when she can do so with the assurance that Products' labeling is consistent with its composition.

10

Class Allegations

69.     The class will consist of all purchasers of the Products who reside in New York and Wyoming during the applicable statutes of limitations.

70.     Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

71.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

72.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

73.     Plaintiff is an adequate representative because her interests do not conflict with other members.

74.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

75.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

76.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

77.     Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350
(Consumer Protection Statutes)

78.     Plaintiff incorporates by reference all preceding paragraphs.

79.     Plaintiff and class members desired to purchase products without high levels of toxic heavy metals.

11

80.     Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

81.     Defendant misrepresented the Products through its statements, omissions, ambiguities, half-truths and/or actions.

82.     Defendant intended that Plaintiff and the Class rely upon Defendant's deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

83.     Defendant knew or should have known that its representations about the Product's flavoring source were material and likely to mislead consumers.

84.     Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

85.     Plaintiff incorporates by reference all preceding paragraphs.

86.     The Product was manufactured, labeled and sold by defendant and warranted to plaintiff and class members that it possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and health-related attributes which it did not.

87.     The absence of toxic heavy metals was impliedly warranted because of the numerous health-related statements, among other things.

88.     Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

89.     This duty is based on Defendant's outsized role in the market for this type of Product.

90.     Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

91.     Defendant received notice and should have been aware of these misrepresentations

12

due to numerous complaints by consumers to its main office over the past several years regarding the Product.

92.    The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

93.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

94.    Plaintiff incorporates by reference all preceding paragraphs.

95.    Defendant had a duty to truthfully represent the Products, which it breached.

96.    This duty is based on defendant's position, holding itself out as having special knowledge and experience in the sale of the product type.

97.    The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

98.    Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

99.    Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Fraud

100.    Plaintiff incorporates by reference all preceding paragraphs.

101.    Defendant misrepresented and/or omitted the attributes and qualities of the Products.

102.    Defendant's fraudulent intent is evinced by its failure to accurately disclose the issues described herein, when it knew not doing so would mislead consumers.

103.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

### Unjust Enrichment

104.   Plaintiff incorporates by reference all preceding paragraphs.

105.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   February 11, 2021

Respectfully submitted,

14

15

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan
60 Cutter Mill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

1:21-cv-01271
United States District Court
Southern District of New York

Stephanie Soto, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Nurture, Inc.,

Defendant

## Class Action Complaint

Sheehan & Associates, P.C.
60 Cutter Mill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  February 11, 2021

/s/ Spencer Sheehan
Spencer Sheehan